[Cite as *State v. Hashi*, 2020-Ohio-177.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT


STATE OF OHIO

     Plaintiff-Appellee

-vs-

ABDI HASHI

     Defendant-Appellant

JUDGES:
Hon. William B. Hoffman, P. J.
Hon. John W. Wise, J.
Hon. Patricia A. Delaney, J.

Case No. 18 CAA 12 0097

O P I N I O N


CHARACTER OF PROCEEDING:     Criminal Appeal from the Court of Common Pleas, Case No. 18 CRI 040196


JUDGMENT:     Affirmed


DATE OF JUDGMENT ENTRY:     January 22, 2020


APPEARANCES:

For Plaintiff-Appellee

MELISSA A. SCHIFFEL
PROSECUTING ATTORNEY
DOUGLAS DUMOLT
ASSISTANT PROSECUTOR
35 North Sandusky Street
Delaware, Ohio  43015

For Defendant-Appellant

APRIL F. CAMPBELL
CAMPBELL LAW, LLC
545 Metro Place South
Suite 100
Dublin, Ohio  43017

*Wise, J.*

**{¶1}** Defendant-Appellant Abdi Hashi appeals his conviction and sentence entered in the Delaware County Common Pleas Court following a jury trial.

**{¶2}** Plaintiff-Appellee is the State of Ohio.

## STATEMENT OF THE CASE

**{¶3}** On April 13, 2018, the Delaware County Grand Jury indicted Appellant Abdi Hashi on one count of aggravated trafficking in drugs and one count of possession of drugs. Both counts were felonies of the first degree and contained specifications that Appellant was a major drug offender.

**{¶4}** On July 13, 2018, Appellant filed a motion to suppress.

**{¶5}** On July 27, 2018, the State filed a response to Appellant's motion to suppress.

**{¶6}** On October 17, 2018, a hearing was held on Appellant's motion to suppress.

**{¶7}** On October 22, 2018, the trial court denied Appellant's motion to suppress.

**{¶8}** After several requests for continuances, the matter was set for trial on November 13, 2018.

**{¶9}** On the morning of trial, Appellant filed a motion to continue. The trial court denied said motion, and the case proceeded to trial.

**{¶10}** At the trial in this matter, the jury heard the following testimony:

**{¶11}** Amanda Carson testified that she is a manager at a UPS Store in Delaware County, and that on August 17, 2017, a package arrived unexpectedly and without a recipient mailbox. T. at 217. The label indicated it was coming from Germany, and no one had called ahead to let her know to receive a delivery. T. at 216- 218. She didn't know

the business name and did not have it listed as a package on the list of packages scheduled to be delivered to the store. T. at 216. She explained that it was unusual to receive a package for someone who did not have a mailbox at the store. Upon receipt, Carson noticed damage to the package; the cardboard box was wet, and it was starting to break and open up. T. at 226. As she began to tape the package, she saw a leafy asparagus-like substance inside the box. It was green, wet, and musty. T. at 225-226. She did not open the box further at that time. However, she noted the smell of the box was similar to one she received in 2009. T. at 226.

{¶12} Carson explained that back in 2009, she became familiar with a plant called khat when she as working at a different UPS store. T. at 221. At that time, khat had been shipped to her store, and she had the opportunity to observe it. She recalled it was a green, leafy, asparagus like plant with a musty damp smell to it. T. at 223. When she looked online, back in 2009, the pictures of khat she observed matched what she observed was delivered to her store at that time. T. at 225. The smell of the package in this case, as well as the plant material inside, was similar to what she previously observed in 2009. T. at 226. Based upon her prior experience, she became suspicious of the package and contacted the Delaware County Sherriff. T. at 229.

{¶13} Deputy Gibson arrived approximately two hours and forty-five minutes after the package arrived at the UPS store. T. at 229. While he was there and Carson was filling out a statement, Appellant arrived to retrieve the package. T. at 230. Deputy Gibson advised Carson to give Appellant the package. Another employee checked Appellant's identification and had Appellant pay the Five Dollars ($5.00) to receive the package,

which is the standard fee for individuals who do not have a box at the store. T. at 232. Shortly thereafter, Deputy Gibson made contact with Appellant. *Id.*

**{¶14}** Deputy Gibson testified regarding his extensive law enforcement training and experience; this experience included advanced drug detection and identification. T. at 419-424. He explained that on August 17, 2017, he was on duty and received a call from Amanda Carson about a suspicion package that had been delivered to her UPS store on Polaris Parkway in Delaware County. T. at 423-424. Deputy Gibson then travelled to the UPS store and parked his marked cruiser behind the building. T. at 426. After talking with Carson, he examined the suspicious package. It was addressed to "Bronson Auto Tuning," a business he determined to be a fictitious business, with Appellant's name underneath. T. at 428. When he examined the package on that date, he could only see "a little" inside the package. However, he noticed a unique odor that was coming from inside the package that he had never smelled before. T. at 429. This all occurred in the back of the UPS store. T. at 430.

**{¶15}** Roughly twenty minutes after Deputy Gibson arrived at the UPS store, Appellant arrived to pick up his package. T. at 430. After he saw Appellant enter the store, Deputy Gibson waited out of view until he was informed Appellant had paid for the package. At that point, he made himself known to Appellant. T. at 431. Appellant was holding the suspicious package when Deputy Gibson first made contact with him. T. at 453. Deputy Gibson then had a conversation with Appellant that was recorded. T. at 433. The recording of the encounter, which lasted roughly ten minutes, was played for the jury. T. at 433.

{¶16} Appellant said he was at the UPS store to pick up the package. T. at 436:1. He claimed that Ali, a friend of his, sent him there to pick up the package. T. at 436; 439. Deputy Gibson told Appellant that he knew what was in the package and asked Appellant if it was khat. T. at 437. When asked about the weight of the package, Appellant explained that it was not just for him, but was for the community. T. at 440. Appellant informed Deputy Gibson that they chew khat. T. at 438. Deputy Gibson described Appellant as acting extremely nervous even in response to general questions. T. at 438. Deputy Gibson also described Appellant as being evasive. T. at 438.

{¶17} Appellant stated he would pay approximately Four Dollars ($4.00) per piece to get the khat from Germany. T. at 442. Appellant further explained that he chewed no more than two pieces a day and estimated there were seventy to eighty pieces were contained in the box. T. at 443. Appellant again explained he was there to pick up the package for his friend, that they chew the khat together, and that he would receive five (5) pieces as his share for getting the package. T. at 444. Appellant said there were twenty (20) or thirty (30) pieces of khat in each bundle in the package. T. at 444.

{¶18} Based upon Appellant's estimated value, the 99 bundles of Khat would be valued at approximately $8,000 dollars. T. at 448. Deputy Gibson stated that it was his opinion the khat was not solely for personal use as there were approximately 2000 stalks in the package. Chewing only two pieces a day, as Appellant claims he did, would take a very long time to use the quantity he received in this case. He explained this belief was consistent with Appellant's statement that the khat was for the community. T. at 448.

{¶19} Matthew Congleton testified in this case regarding the testing and analysis of the khat in this case. T. at 245-418. Congleton is a forensic scientist employed by BCI

since 1998 trained to perform laboratory testing on suspected controlled substances. T. at 246-255. He testified the suspected khat in this case was received by BCI in September of 2017 and frozen until he conducted his testing on it in October of 2017. T. at 261. The khat was packaged as 20 individually wrapped bundles of plant material. T. at 264. The weight of the plant material itself, without any packaging, was 3,913.7 grams. T. at 281. Based upon his training and experience, Congleton suspected the plant material might be khat and contain the controlled substance "cathinone." T. at 268, 351. He explained that cathinone differed from another controlled substance, cathine, in that cathinone is a Schedule I substance and cathine is a Schedule IV substance. T. at 270. In this case, pursuant to BCI's testing policy, Congleton only looked for the presence of cathinone in his testing. T. at 271. He further testified the bulk amount of cathinone is 30 grams, and the weight of the plant material suspected of containing cathinone was greater than 100 times bulk amount. T. at 282.

{¶20} Testing of the suspected khat in this case occurred using a gas chromatography-mass spectrometer (GC-MS) test and a gas chromatography-flame ionization detector (GC-FID) test. T. at 288. When the testing was performed in this case, Congleton received data unique to cathinone which allowed him to conclude the plant material contained cathinone. T. at 292-293. He testified that based upon the data he received from the MC-MS testing, he was 100 percent certain the material he examined contained cathinone. T. at 294; 348. Congleton testified he visually does a comparison of the data he received from the computer and compares it directly to the GC-MS graphs. T. at 313-314. The results of the GC-FID testing also revealed that the material he examined contained cathinone. T. at 296.

**{¶21}** On November 15, 2018, the jury found Appellant guilty on both counts with the additional finding.

**{¶22}** On November 16, 2018, the trial court sentenced Appellant to the mandatory minimum prison term of eleven (11) years.

**{¶23}** Appellant now appeals, assigning the following error for review:

<u>ASSIGNMENTS OF ERROR</u>

**{¶24}** "I. THE TRIAL COURT'S DECISION TO OVERRULE HASHI'S MOTION TO SUPPRESS WAS REVERSIBLE ERROR, REQUIRING REVERSAL OF HASHI'S CONVICTIONS.

A. THE TRIAL COURT ERRED IN FINDING THAT HASHI'S ENCOUNTER WITH DEPUTY GIBSON WAS CONSENSUAL RATHER THAN A SEIZURE, WHICH MUST BE SUPPORTED BY A REASONABLE SUSPICION OF CRIMINAL ACTIVITY.

B. THE DEPUTY DID NOT HAVE THE REQUISITE REASONABLE ARTICULABLE SUSPICION TO SEIZE HASHI, NOR PROBABLE CAUSE TO SEIZE THAT PACKAGE. THUS, ALL EVIDENCE THAT FLOWED FROM THOSE ACTS SHOULD HAVE BEEN SUPPRESSED.

C. THE TRIAL COURT ERRED IN FINDING THAT HASHI GAVE CONSENT TO OPEN THE UPS PACKAGE WITHOUT A WARRANT, BECAUSE HASHI ACQUIESCED TO POLICE AUTHORITY, REQUIRING REVERSAL OF HASHI'S CONVICTIONS.

D. BECAUSE NO PERSON IN HASHI'S POSITION WOULD HAVE FELT AT LIBERTY TO TERMINATE THE DEPUTY'S INTERVIEW AND

LEAVE WHEN HASHI MADE STATEMENTS TO THE DEPUTY, HIS STATEMENTS WERE SUBJECT TO SUPPRESSION.

**{¶25}** "II. HASHI'S MOTION TO CONTINUE HIS TRIAL SHOULD HAVE BEEN GRANTED, BECAUSE FAILURE TO CONTINUE IT RESULTED IN HASHI'S RIGHT TO ASSIST IN HIS OWN DEFENSE BEING INFRINGED.

**{¶26}** "III. BECAUSE HASHI'S INDICTMENT WAS FATALLY DEFECTIVE FOR FAILING TO ALLEGE AN ESSENTIAL ELEMENT, HASHI'S CONVICTIONS SHOULD BE REVERSED.

**{¶27}** "IV. HASHI'S CONFRONTATION RIGHT WAS VIOLATED BY THE TRIAL COURT'S DECISION TO ALLOW SURROGATE TESTIMONY REGARDING TWO REVIEWS BY OTHER CHEMISTS OF THE TESTING ANALYST'S WORK.

**{¶28}** "V. THE STATE PRESENTED INSUFFICIENT EVIDENCE THAT HASHI POSSESSED OR TRAFFICKED A SCHEDULE I CONTROLLED SUBSTANCE AS A MATTER OF LAW.

A. THE STATE PRESENTED INSUFFICIENT EVIDENCE AS A MATTER OF LAW THAT HASHI POSSESSED OR TRAFFICKED A SCHEDULE I CONTROLLED SUBSTANCE, REQUIRING REVERSAL OF HIS CONVICTIONS.

B. THE STATE PRESENTED INSUFFICIENT EVIDENCE AS A MATTER OF LAW THAT HASHI POSSESSED OR TRAFFICKED A FIRST-DEGREE FELONY LEVEL OF A SCHEDULE I CONTROLLED SUBSTANCE, REQUIRING REVERSAL OF HIS CONVICTIONS.

C. THE STATE'S EVIDENCE THAT HASHI TRAFFICKED A

SCHEDULE I SUBSTANCE WAS LEGALLY INSUFFICIENT AS A

MATTER OF LAW, REQUIRING REVERSAL.

**{¶29}** "VI. BECAUSE THE EVIDENCE WEIGHED MANIFESTLY AGAINST CONVICTING HASHI OF TRAFFICKING AND POSSESSING A SCHEDULE I CONTROLLED SUBSTANCE, HIS CONVICTIONS SHOULD BE REVERSED.

**{¶30}** "VII. BECAUSE THE PROSECUTOR ENGAGED IN PROSECUTORIAL MISCONDUCT WHICH DENIED HASHI'S RIGHT TO A FAIR TRIAL, HASHI'S MOTION FOR MISTRIAL SHOULD HAVE BEEN GRANTED.

**{¶31}** "VIII. HASHI WAS DENIED HIS RIGHT TO A FAIR TRIAL IN THIS CASE BECAUSE OF CUMULATIVE ERROR."

**I.**

**{¶32}** In his first assignment of error, Appellant argues that the trial court erred in denying his motion to suppress. We disagree.

**{¶33}** There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's finding of fact. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this third type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in the given case. *See State v. Fanning* (1982), 1 Ohio St.3d 19, 437 N.E.2d 583; *State v. Williams* (1993), 86 Ohio App.3d 37, 619 N.E.2d 1141; *State v. Curry*

(1994), 95 Ohio App.3d 93, 96, 641 N.E.2d 1172; *State v. Claytor* (1993), 85 Ohio App.3d 623, 627, 620 N.E.2d 906; *State v. Guysinger* (1993), 86 Ohio App.3d 592, 621 N.E.2d 726. The United States Supreme Court has held that as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. *See Ornelas v. United States* (1996), 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911.

**{¶34}** Appellant herein argues Deputy Gibson did not have reasonable suspicion to initiate a conversation with him, that Deputy Gibson's search of the package was unlawful, and that any statements he made were the result of an improper custodial interrogation.

*Consensual Encounter*

**{¶35}** Appellant first argues the court erred in finding the officers had a reasonable suspicion of criminal activity to justify initiating a conversation with him at the UPS store.

**{¶36}** Interactions between citizens and law enforcement officers can fall within three distinct categories: a consensual encounter, an investigative detention, and an arrest. *State v. Taylor*, 106 Ohio App.3d 741, 747-749, 667 N.E.2d 60(1995).

**{¶37}** "Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away." *Taylor* at 747, 667 N.E.2d 60, citing *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). "The Fourth Amendment guarantees are not implicated in such an encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a

reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter." *Id.* at 747-748, 667 N.E.2d 60.

**{¶38}** The State argues the encounter here was consensual, but failing that, argues the deputy still had adequate suspicion to justify detaining Appellant. Appellant argues the information from the UPS worker was unreliable and therefore provided no evidence that he was engaged in any illegal activity.

**{¶39}** Upon review, we find the initial encounter here was consensual. Although some of the initial statements made by the deputy to Appellant could be viewed as orders, such as telling him to put down the package and directing him where to stand, the video of the encounter reveals that the encounter took place in a public place, Appellant was not restrained from leaving the area, Appellant was told repeatedly that he was not in custody and was free to leave, and was told that he was not going to be arrested that day. The officer never raised his voice or made any show of force or authority. *See State v. Yacobucci,* 5th Dist. Delaware No. 18 CAC07 0055, 2019-Ohio-36 ¶32.

*Reasonable Suspicion*

**{¶40}** We further find that the officer had reasonable suspicion to detain Appellant even if the encounter is viewed as an investigatory detention rather than a consensual encounter.

**{¶41}** Reasonable suspicion constitutes something less than probable cause. *State v. Logan,* 5th Dist. Richland No. 07–CA–56, 2008–Ohio–2969, ¶ 15, citing *State v. Carlson* (1995), 102 Ohio App.3d 585, 590. Also, it is well-established that an officer's reasonable articulable suspicion does not require proof beyond a reasonable doubt that the defendant's conduct has satisfied the elements of the offense. *State v. Willis,* 5th Dist.

Licking No. 14 CA 103, 2015–Ohio-3739, ¶ 25, citing *Westlake v. Kaplysh,* 118 Ohio App.3d 18, 20, 691 N.E.2d 1074 (8th Dist.1997).

**{¶42}** Here, information from the identified UPS store manager indicated that an odor of khat was emanating from one of the packages and explained her basis for that knowledge. Upon arrival to the UPS store, the deputy himself was able to verify the unusual odor coming from the package. Deputy Gibson was aware that possession of khat was illegal.  In his conversation with the deputy, appellant claimed he did not know what was in the package and that the package was not for him even though the package was addressed to him and he came to pick up the package. Based on these facts, we find the totality of the circumstances here warranted the investigatory detention.

*Consent to Search*

**{¶43}** We further find that the Appellant in this case consented to a search of the package. The deputy asked Appellant three times if he would consent to the search. Appellant initially answered "it's in your hands" but then stated he would consent if he was not going to be arrested. After being given assurance that he would not be arrested that day, but could be charged in the future, he told Deputy Gibson "Yeah, go ahead."

*Miranda Warnings*

**{¶44}** Appellant also argues that the deputy should have read him Miranda warnings.

**{¶45}** Upon review, we find "police are not required to administer *Miranda* warnings to everyone whom they question." *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997), citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50

L.Ed.2d 714, 719 (1977). This is true when an individual is not in police custody, or is merely temporarily restrained.

{¶46} The temporary restraint of a person, such as that required of those present in a home during the execution of a search warrant, does not invoke the "full panoply of Fourth Amendment protections * * * for no actual arrest has occurred." *State v. Schultz*, 23 Ohio App.3d 130, 135, 491 N.E.2d 735 (1985), citing *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Temporary restraint of occupants during the search of a home is justified by "substantial law enforcement interests" such as officer safety, occupant safety and the orderly execution of the search, as long as police have an articulable basis for suspecting criminal activity. *State v. Jester*, 12th Dist. Butler No. CA2010-10-264, 2012-Ohio-544, 2012 WL 441136, ¶ 18 citing *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

{¶47} Based on our above findings, we find no Miranda warnings were required in this case.

{¶48} Appellant's first assignment of error is overruled.

## II.

{¶49} In his second assignment of error, Appellant argues the trial court erred in denying his Motion to continue. We disagree.

{¶50} The decision to grant or deny a motion to continue is entrusted to the broad discretion of the trial court. *Hartt v. Munobe,* 67 Ohio St.3d 3, 9, 615 N.E.2d 617 (1993); *State v. Unger*, 67 Ohio St.2d 65. Ordinarily, a reviewing court analyzes a denial of a continuance in terms of whether the court has abused its discretion. *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *State v. Wheat,* 5th Dist. Licking

App. No. 2003–CA–00057, 2004–Ohio–2088. An abuse of discretion connotes more than a mere error in law or judgment; it implies an arbitrary, unreasonable, or unconscionable attitude on the part of the trial court. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶51}** In evaluating whether the trial court has abused its discretion in denying a continuance, appellate courts apply a balancing test which takes into account a variety of competing considerations, including the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; and whether the defendant contributed to the circumstance which gives rise to the request for a continuance. *State v. Unger, supra.*

**{¶52}** In the case before us, Appellant moved for a continuance on the morning of trial, alleging personal family issues would prevent him from focusing on the trial. T. at 7. In denying the continuance, the trial court explained that the trial had already been continued a number of time at Appellant's request and had been pending over six months. T. at 8-9.

**{¶53}** Appellant's second assignment of error is overruled.

### III.

**{¶54}** In his third assignment of error, Appellant argues the indictment was fatally defective for failing to allege an essential element. We disagree.

**{¶55}** " 'Article I, Section 10 of the Ohio Constitution provides that "no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or

indictment of a grand jury." Thus, the Ohio Constitution guarantees an accused that the essential facts constituting the offense for which he is tried will be found in the indictment by the grand jury.' " *State v. Jackson*, 134 Ohio St.3d 184, 2012–Ohio–5561, 980 N.E.2d 1032, ¶ 12; quoting *State v. Pepka*, 125 Ohio St.3d 124, 2010–Ohio–1045, 926 N.E.2d 611, ¶ 14; citing *Harris v. State*, 125 Ohio St. 257, 264, 181 N.E. 104 (1932). As noted in *Jackson* at ¶ 12, "Crim.R. 7(B) provides, 'The statement [specifying the offense in an indictment] may be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged.' "

{¶56} " 'An indictment meets constitutional requirements if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." ' " *Jackson* at ¶ 13; quoting *State v. Childs*, 88 Ohio St.3d 558, 565, 728 N.E.2d 379 (2000); in turn quoting *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887 (1974). " 'Generally, the requirements of an indictment may be met by reciting the language of the criminal statute.' " *Jackson* at ¶ 14; quoting *State v. Childs*, 88 Ohio St.3d 194, 199, 724 N.E.2d 781 (2000); citing *State v. Murphy*, 65 Ohio St.3d 554, 583, 605 N.E.2d 884 (1992). However, "if the indictment does not name the essential elements of the criminal offense charged, the indictment is insufficient to charge the defendant with that offense." *Jackson* at ¶ 14; citing *State v. Jester*, 32 Ohio St.3d 147, 149, 512 N.E.2d 962 (1987).

**{¶57}** In *State v. Horner*, 126 Ohio St.3d 466, 2010–Ohio–3830, 935 N.E.2d 26, ¶ 10, the Supreme Court of Ohio noted that "[t]he purpose of a grand jury indictment has always been to give notice to the accused: '[A] criminal offense must be charged with reasonable certainty in the indictment so as to apprise the defendant of that which he may expect to meet and be required to answer; so that the court and jury may know what they are to try, and the court may determine without unreasonable difficulty what evidence is admissible.' " Quoting *Horton v. State*, 85 Ohio St. 13, 19, 96 N.E. 797 (1911). Further, it should be noted that the Court held in *Horner* that "failure to timely object to a defect in an indictment constitutes waiver of the error." *Horner* at ¶ 46; citing Crim.R. 12(C)(2) (objections to defect in indictment must be raised before trial.).

**{¶58}** Here we find that the indictment is sufficient as it alleges, correctly, that Appellant possessed and trafficked a Schedule I controlled substance, cathinone.

**{¶59}** We further find that because Appellant failed to timely object to any alleged error, he has waived any issues with regard to same.

**{¶60}** Appellant's third assignment of error is overruled.

**IV.**

**{¶61}** In his fourth assignment of error, Appellant argues that the trial court erred in allowing the State to present certain testimony and evidence at trial which denied him his Sixth Amendment right to confront the witnesses against him. We disagree.

**{¶62}** The Sixth Amendment to the United States Constitution provides, "[i]n all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him." Likewise, Section 10, Article I of the Ohio Constitution provides, "[i]n any trial, in any court, the party accused shall be allowed to meet the witnesses face

to face." The Supreme Court of the United States has held that evidence that is "testimonial hearsay" offends a defendant's Sixth Amendment right to confrontation and is not admissible. *Crawford v. Washington*, 541 U.S. 36, 51, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *State v. Ricks*, 2013-Ohio-3712, ~ 18, 136 Ohio St. 3d 356,361,995 N.E.2d 1181, 1187; *State v. Maxwell*, 2014-Ohio-1019, ~ 131, 139 Ohio St. 3d 12, 41, 9 N.E.3d 930, 964 ("Crawford also stated that the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); *State v. McKelton*, 2016-Ohio-5735, ¶217, 148 Ohio St. 3d 261, 300, 70 N.E.3d 508, 562.

**{¶63}** Here, Appellant argues the witness Matthew Congleton, from the BCI lab, was allowed to present "substitute testimony for other chemists who reviewed and certified Congleton's work. (Appellant's Brief at 26).

**{¶64}** At trial, Congleton testified that other personnel in the laboratory made "sure that everything was done appropriately and in a correct manner and to assure they agree with the findings on [his] report when compared to [his] data. T. at 340-341. Congleton also testified that his work was administratively reviewed by a member of his management and resulted in his testing method being approved. T. at 341.

**{¶65}** Upon review, we find no Sixth Amendment violation. We do not find these statements to be testimonial in nature but rather find that these statements refer to the review procedure and explain how such review occurs and what others in the lab did, not what they said.

**{¶66}** Appellant also challenges the last page of State's Ex. 12, which is a single page document consisting of a technical review checklist, completed by another BCI chemist.

**{¶67}** The trial court, after reviewing said document, found it to be merely a statement verifying that the case number was "properly listed and the name of the agency that sent the exhibit is properly listed and all the appropriate documents that are supposed to be here are here." T. at 302.

**{¶68}** Further, the State explained that the document was not being authorized for the truth of the matter asserted, but rather to show BCI s laboratory procedures for the testing of chemical substances.

**{¶69}** Upon review, we find no error in the trial court's decision to allow the use of said document for the limited purpose for which it was offered – as an illustration of the procedures followed by BCI for the testing of substances and generating of reports.

**{¶70}** Appellant's fourth assignment of error is overruled.

**V., VI.**

**{¶71}** In his fifth and sixth assignments of error, Appellant argues his convictions for possessing or trafficking a Schedule I controlled substance were against the manifest weight and sufficiency of the evidence. We disagree.

**{¶72}** The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins,* 78 Ohio St.3d 380, 1997–Ohio–52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio

Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶73} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins, supra*, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶74} Appellant herein was convicted of one count of drug trafficking pursuant to R.C. §2925.03(A)(2) and one count of drug possession pursuant to R.C. §2925.11(A),which provide:

**R.C. §2925.03 <u>Trafficking Offenses</u>**

(A) No person shall knowingly do any of the following:

(1) ***

(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance

analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

**R.C. §2925.11 <u>Drug Possession Offense</u>**

(A) No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog.

**{¶75}** As set forth above in the Statement of the Facts, the State presented evidence that Appellant appeared at the UPS store to claim the package, which was addressed to him, within hours of its arrival at the store. T. at 230, 428. Appellant paid for the package and then took physical possession of the package. T. at 232, 453. Appellant admitted that he knew the package contained khat. T. at 437.

**{¶76}** Further, Appellant stated that he paid approximately Four Dollars ($4.00) per piece to have the khat shipped from Germany, and that the khat in this package was "for the community", not just him. T. at 440, 442.

**{¶77}** Matthew Congleton testified that he performed an analysis of the khat, that it contained cathinone, and that cathinone is a Schedule I substance. T. at 245-418. He further testified that the bulk amount of cathinone is 30 grams, and the contents of the package in this case weighed 3,913.7 grams. T. at 281-282.

**{¶78}** Based on the foregoing, we find the State presented sufficient evidence that Appellant conspired or solicited with another to ship a Schedule I substance (Khat/cathinone) to the United States, that he took possession of the khat, and that he possessed it with the purpose of distributing it. We therefore find the State satisfied the elements of possession and trafficking in this case.

**{¶79}** The jury, as the trier of fact, was free to accept or reject any and all of the evidence offered by the parties and assess the witnesses' credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Johnson*, 5th Dist. Stark No. 2014CA00189, 2015–Ohio–3113, 41 N.E.3d 104, ¶ 61, citing *State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). The jury need not believe all of a witness' testimony, but may accept only portions of it as true. *Id.*

**{¶80}** Construing all of the evidence in favor of appellee, sufficient evidence supports appellant's convictions. Also, this is not the case in which the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be overturned and a new trial ordered.

**{¶81}** Appellant's conviction is not against the manifest weight or sufficiency of the evidence.

**{¶82}** Appellant's fifth and sixth assignments of error are overruled.

**VII.**

**{¶83}** In his seventh assignment of error, Appellant argues he was denied a fair trial based on prosecutorial misconduct. We disagree.

**{¶84}** The test for prosecutorial misconduct is whether the prosecutor's remarks and comments were improper and if so, whether those remarks and comments prejudicially affected the substantial rights of the accused. *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990), cert. denied, 498 U.S. 1017, 111 S.Ct. 591, 112 L.Ed.2d 596 (1990). In reviewing allegations of prosecutorial misconduct, we must review the

complained-of conduct in the context of the entire trial. *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

**{¶85}** Here, Appellant argues the prosecutor engaged in misconduct by calling Appellant's expert witness a liar. Appellant also alleged that the prosecutor improperly sought to shift the burden of proof onto Appellant during closing arguments.

**{¶86}** During closing argument, the prosecutor made the following statements:

"Now Dr. Belloto told you this could be anything. This could be any substance. This could be a number of substances. What substance did he tell you this could be? Not one substance did he tell you. There's hundreds of thousands of substances in the database that he uses and Mr. Congleton uses and he didn't give you an example of one other substance using a mass spec run that this could possibly be besides cathinone. Not one substance did he say. He said it could be a million things, didn't name one. Not one. Now just so we're clear, when Mr. Blake says they're going to tell you you should have done this, should have done that. The Defendant doesn't have a burden of proving anything and I don't expect him to prove anything. I didn't expect him to bring Dr. Belloto in, but if he puts a witness on the stand, here's what we should expect as jurors and as officers of the court, when Dr. Belloto raises his right hand, he should have told the truth, that's what I expect from Dr. Belloto ....... I apologize if I misspoke. It's up to you to decide what, if anything, you believe of what Dr. Belloto said. What I'm telling you is that Mr. Blake said the prosecutor is going to tell you you should have tested the drug, I'm not going to say that What I'm going to tell

you is he should have told the truth when he said he requested to test the

- -" T. at 696-697.

**{¶87}** Additionally, the State prosecutor argued:

But, finally, he told you under oath yesterday in court that he asked to test the plant and was not allowed to do that. Mr. Hashi has a right to have an independent analyst of his choice, including Dr. Belloto, to analyze those plants. They were preserved, they were frozen. … They were preserved, they were frozen. We could not have if we wanted to, and I didn't want to, nor did the judge, we could not have stopped him from doing that if he wanted to do that, and he told you he wanted to do that and was not allowed. You have to decide whether or not that's the truth or not. The State would suggest to you that that was not the truth." T. at 698.

**{¶88}** Upon review of said statements, we find same to be reasonable comments on the evidence and permissible argument. We further find, upon reviewing the prosecutor's remark in the context of the entire trial, these comments did not prejudicially affected the substantial rights of appellant. *State v. Brown,* 5th Dist. Stark No. 2012CA00040, 2013–Ohio–2220, at ¶ 37, appeal not allowed, 136 Ohio St.3d 1512, 2013–Ohio–4657, 995 N.E.2d 1214, ¶¶ 34–38 (2013) and *appeal not allowed,* 137 Ohio St.3d 1462, 2013–Ohio–4657, ¶¶ 34–38 (2013).

**{¶89}** Appellant also claims the State impermissibly attempted to shift the burden of proof by making the following statements during closing argument:

The bottom line is when you go back there, if you deliberate and you look at the science and you say, boy, I don't know, the science could go

either way, just remember if you have any reasonable doubt, Mr. Hashi didn't. Mr. Hashi knew it was khat. He identified it as khat. He chews it because it has cathinone in it. Mr. Hashi knew exactly what he was doing that day, he was trafficking in drugs and he was also possessing drugs for a brief period of time, and under Ohio law, he's guilty of possession and trafficking in 3,900 grams of cathinone contained in the plant khat. T. at 700.

**{¶90}** Upon review, we find Appellant's arguments that this was an attempt to shift the burden of proof to be unpersuasive. Rather, we again find same to be fair and reasonable comment on the evidence.

**{¶91}** Here, we find no misconduct occurred which can be said to have deprived Appellant of a fair trial based on the entire record.

**{¶92}** Appellant's seventh assignment of error is overruled.

**VIII.**

**{¶93}** In his eighth assignment of error, Appellant argues he was denied a fair trial due to cumulative error. We disagree.

**{¶94}** In *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995), the Supreme Court of Ohio held, pursuant to the cumulative error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal."

**{¶95}** Where we have found that the trial court did not err, cumulative error is simply inapplicable. *State v. Carter*, Stark App. No. 2002CA00125, 2003-Ohio-1313 at ¶ 37. With respect to Appellant's arguments that we have already addressed, we do not

find multiple instances of harmless error triggering the cumulative error doctrine. *State v. Scott*, 5th Dist. Richland No.11 CA80, 2012–Ohio3482, ¶ 75–76, appeal not allowed, 133 Ohio St.3d 1491, 2012–Ohio–5459, 978 N.E.2d 910.

{¶96} Appellant's eighth assignment of error is overruled.

{¶97} For the foregoing reasons, the decision of the Court of Common Pleas of Delaware County, Ohio, is affirmed.

By: Wise, J.

Hoffman, P. J., and

Delaney, J., concur.

JWW/d 0103